**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-02011-NYW-KAS

ANDREW THOMAS SCOTT,

Plaintiff,

v.

MICHAEL ALLEN, in his official capacity as the
District Attorney for the 4th Judicial District of Colorado,

Defendant.

---

**ANDREW THOMAS SCOTT'S**
**RESPONSE IN TO MICHAEL ALLEN'S MOTION FOR SUMMARY JUDGMENT**

---

Andrew Thomas Scott (Mr. Scott), by and through his attorneys at Montgomery Little & Soran, PC, submit this Response in Opposition to Michael Allen's Motion for Summary Judgment, ECF No. 121.

## RESPONSE TO STATEMENT OF FACTS

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied. Trooper Hiller's wife is not a protected person under the Statute. C.R.S. § 18-9-313(1)(n) (Westlaw, October 24, 2023) ("'Protected person' means a human services worker, a public health worker, a judge, a peace officer, a prosecutor, a public defender, or a

public safety worker."); *but see* C.R.S. § 18-9-313(2.7) (Westlaw, October 24, 2023) (restricting speech in the interest of "the protected person's immediate family.")

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Mr. Scott admits that he sent a copy of the Affidavit of Service to Trooper Hiller. ECF No. 35, ¶ 47; ECF No. 119-3, p. 6. Mr. Scott denies indicating that he was going to file the Affidavit of Service "with the Court." The underlying subpoena was issued by the Colorado Department of Revenue, not by a court. ECF No. 119-2. Mr. Scott stated that the Affidavit of Service would be filed "in this case." ECF No. 35, ¶ 47; ECF No. 119-3, p. 6. A filing with the Department of Revenue is not published on the internet.

13. Admitted. *See* ECF No. 119-5, p. 8.

14. Admitted. *See* ECF No. 119-5, p. 8.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

## Standard of Review

The standard of review on a motion for summary judgment is well known. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, [courts] view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023).

Mr. Allen's motion suggests that the Court should apply a principle of Colorado constitutional jurisprudence presuming state statutes are constitutional and placing the burden on the challenger. However, that principle is foreign to federal constitutional jurisprudence. *Cf. People v. Counterman*, 2021 COA 97, ¶ 32 ("We presume that a statute is constitutional, and the party challenging the statute has the burden of proving unconstitutionality beyond a reasonable doubt") (internal quotation omitted) *with Counterman v. Colorado*, 143 S. Ct. 644, 214 L. Ed. 2d 382 (2023) (reversing without such a presumption and without such a standard of proof).

Rather, "the Constitution demands that content-based restrictions on speech be presumed invalid, . . . and that the Government bear the burden of showing their constitutionality . . . ." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004) (internal citations omitted). "The heavy burden of demonstrating that a content-based restriction is 'the least restrictive means among available, effective alternatives' lies with the government." *Peck v. McCann*, 43 F.4th 1116, 1135 (10th Cir. 2022) (quoting *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 665–66 (2004)). "[T]he Government bears the *burden of proof* on the ultimate question of [a law's] constitutionality. *Ashcroft*, 542 U.S. at 666 (emphasis added).

## ARGUMENT

Mr. Allen says that the Statute is "a content-based restriction of speech" and that strict scrutiny applies. ECF No. 121, p. 6-7. Mr. Scott agrees. Mr. Allen says that the Statute "does not involve a 'true threat.'" ECF No. 121, p. 9. Mr. Scott agrees. Mr. Allen fails to present any evidence to substantiate Colorado's purported interest in restricting the content of free speech related to public servants, as is his burden. *Peck*, 43 F.4th at 1135. Mr. Allen is wrong when he suggests that the Statute serves a compelling state interest in protecting favored persons from the specter that publication of their personal identifying information "can cause serious emotional stress from the fear of violence," "disruption of life's activities" as a result of that fear, or a "possibility" of violence. ECF No. 121, p. 10. The Statute does not proscribe incitement because it is not aimed at speech directed at, and intended to cause, imminent lawless action. Mr. Allen makes no argument whatsoever suggesting that the Statute is narrowly tailored.

Mr. Allen seems to suggest, in the context of discussing the as-applied challenge, that the identification of the particular protected person, is not speech protected by the First Amendment. ECF No. 121, p. 11 (arguing that Mr. Scott could communicate his message "without providing the personal information proscribed by the statute.") The identification of the protected person, such that other members of the public can communicate with the protected person, is itself constitutionally protected speech (and as discussed below, is an integral part of Mr. Scott's message). The Statute defines the proscribed "personal information" to include, *inter alia*, the protected person's photograph, email address, and telephone number, as well as photographs of the person's home or directions to the home. C.R.S. 18-9-313(1)(*l*). Yet, the publication of "personal identifying information," including "residential address[es]" and "residential telephone

number[s]" is constitutionally protected speech. *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1142 (W.D. Wash. 2003). Indeed, as related to discussions of the fitness of various public servants, identification of the public servant is essential often to the message.

Colorado's interest in enacting and enforcing the Statute is ill defined. The act of the General Assembly originally creating the Statute, and the misdemeanor therein, makes no findings of fact or declarations of purpose. 2002 Colo. Legis. Serv. Ch. 292 (H.B. 02–1113) (WEST). No published judicial opinions have construed the Statute. Mr. Allen, as a district attorney, says, without any evidence and without any elaboration, that sometimes the publication of a protected person's personal information gives rise to a "fear of violence," resulting in "serious emotional stress" and "disruption of life's activities" as well as "possibility" that violence will occur. ECF No. 121, p. 9-10. In cases of content-based restrictions of free speech, when a defendant "merely insist[s] that someone out there could, in theory," misuse information to bad ends, such a theoretical argument "is not proof" bur rather "it is merely speculation, which is not enough to meet Defendants' burden under strict scrutiny." *Peck*, 43 F.4th at 1136.

Mr. Allen admits that the proscribed speech does not constitute a "true threat." The state does not have a compelling interest in curbing speech that may lead to violence. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). The state only has an interest in curbing true threats that themselves communicates a threat of violence to the listener, *Virginia v. Black*, 538 U.S. 343, 359 (2003), and incitement "*directed* to inciting or producing" imminent violence, *Brandenburg*, 395 U.S. at 447.

Speech truly threatening violence may be proscribed because the state may "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the

possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Because a true threat, by definition, communicates that the speaker "means to commit an unlawful act of violence," a true threat may be constitutionally proscribed on *means rea* of recklessness. *Counterman v. Colorado*, 143 S. Ct. 2106, 2114, 216 L. Ed. 2d 775 (2023). Legally, "[s]imply publishing an officer's phone number, address, and e-mail address is not in itself a [true] threat." *Brayshaw v. City of Tallahassee, Fla*., 709 F. Supp. 2d 1244, 1248 (N.D. Fla. 2010). Knowledge of a risk, or reasonable awareness of a risk, that some third-person may misuse the speech to create a threat to safety does not convert the speech itself into a threat. *Brayshaw v. City of Tallahassee, Fla*., 709 F. Supp. 2d 1244, 1248 (N.D. Fla. 2010) ("the release of personal information, *even with the intent* to intimidate, is not per se a true threat") (emphasis added). While Mr. Allen might be suggesting that "the release of personal identifying information regarding individuals, together with the intent to harm or intimidate, constitutes a threat" such an argument "is fundamentally incorrect" and must fail "as a matter of law." *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1141 (W.D. Wash. 2003).

When harm from a person other than the speaker is to be mitigated, the government may not curtail the speech unless (i) the speech is "directed to inciting or producing imminent lawless action," *Brandenburg*, 395 U.S. at 447, and (ii) "the speaker's words were 'intended' (not just likely) to produce imminent" lawless action, *Counterman*, 143 S. Ct. at 2115; *id.* at 2136–37 (Barrett, J., dissenting) ("Speakers must specifically intend to incite violence before they lose First Amendment protection.") The Statute here is overbroad on both elements. The Statute

criminalizes publication of personal information whenever it "poses" a threat to "safety," not just when it is "directed" to "lawless action," and does not require intentional harms.

First, the verb, "pose," is problematic. The Compact Edition of the Oxford English Dictionary (Oxford University Press 1971) defines the verb to mean to "place in a specified situation or condition," to "suppose or assume for arguments sake," to "lay down, put forth an assertion, allegation, claim, instance, etc.," and to "place in an attitude." In the context of the Statute, which proscribes speech in advance of a harm caused by third-persons, the verb "pose" does not require actual threats to safety—which can never in fact exist prior to the publication of the speech—but rather the Statute proscribes speech that *could* be used to create a (imminent and serious) *risk* of a threat to safety. The fact that the Statute *only* regulates the publication of the personal information "on the internet" shows that the statute is geared towards risks from persons unknown. Speech that can be misused by another to create a threat to safety is not directed to cause lawless action. *Brandenburg*, 395 U.S. at 447. Thus, the publication of "addresses and telephone numbers of police officers [] are not 'fighting words' or incitements to imminent lawless action. *Brayshaw v. City of Tallahassee, Fla.*, 709 F. Supp. 2d 1244, 1248 (N.D. Fla. 2010).

Second, the phrase "serious threat to the protected person's safety" is not narrowly tailored to preventing lawless action. There are innumerable situations where lawful acts could give rise to a threat to safety. For example, a lawful protest outside of a police officer's home of 30 persons with unknown intentions and unknown arms may objectively or subjectively threaten safety. Similarly, should a photojournalist capture a picture of an officer performing a particularly controversial duty (the kind that makes tempers flare throughout the masses) and

publish the picture on the internet, the officer's safety may be threatened.[1] Such events may reasonably give rise to a "fear of violence," "disruption" of life activities, and a "possibility" of violence. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). In such circumstances, even if the publisher of the officer's home address actually intended for the protest to form or for the anger of the masses to swell, the publication would not be constitutionally proscribable because those events are lawful. The Statute is overinclusive in proscribing speech that could give rise to lawful threats to safety.

Third, the Statute is not narrowly tailored because criminal penalties apply to the publication of a protected person's personal information even if that personal information was already publicly available. "'[P]unishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act.'" *Sheehan v. Gregoire,* 272 F. Supp. 2d 1135, 1144 (W.D. Wash. 2003) (quoting *The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (1989)). While the Statute establishes procedures for limiting the dissemination of identifying information, the definition of protected persons is not limited to those whose information is truly not public.

Fourth, the Statute is vague as to what constitutes a "serious" threat to "safety." While the concept of a serious risk is common to criminal law and may be generally regarded a question of fact, the Free Speech clause demands clarity. *Counterman v. Colorado,* 143 S. Ct. 2106, 2129, 216 L. Ed. 2d 775 (2023) ("vagueness of content-based regulation of speech is of special concern when it comes to criminal statutes") (Sotomayor, J. concurring) (internal

[1] The Statute restricts the publication of photographs of protected persons. C.R.S. 18-9-313(1)(*l*).

quotations omitted) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–872 (1997)). The First Amendment requires "precision" when a statute regulates the content of speech. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997). Must the threat be so serious as to place the protected person in subjective fear of loss of life or limb and must that fear be objectively reasonable? Would a subjective anxiety of any mischief suffice?

Fifth, the Statute is not narrowly tailored because it is underinclusive in regulating the public identification of protected persons when the identification is made "on the internet." As the Supreme Court explained:

> the facial underinclusiveness of [the law] raises serious doubts about whether [the state] is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance. [The law] prohibits the publication of identifying information only if this information appears in an "instrument of mass communication," a term the statute does not define. [The law] does not prohibit the spread by other means of the identities of victims of sexual offenses. An individual who maliciously spreads word of the identity of a rape victim is thus not covered, despite the fact that the communication of such information to persons who live near, or work with, the victim may have consequences as devastating as the exposure of her name to large numbers of strangers. . . .
>
> When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant. Where important First Amendment interests are at stake, the mass scope of disclosure is not an acceptable surrogate for injury. A ban on disclosures effected by "instrument [s] of mass communication" simply cannot be defended on the ground that partial prohibitions may effect partial relief. . . . Without more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose.

*The Florida Star v. B.J.F.*, 491 U.S. 524, 540–41 (1989). The harm purportedly being regulated here is the public identification of certain public servants; the means of dissemination is not material to that injury. Indeed, the in-person identification of a police officer to a particular gang

member who has a beef with the officer is much more likely to result in harm to the officer than a public internet posting. The limitation of to the Statute to online publication shows that the law is not tailored to the harm. Rather, the Statute, by its plain terms, is draft to chills speech that may be accessed by anyone for any purpose.

Finally, the Statute's *mens rea* is constitutionally infirm when the Statute proscribes speech based upon knowledge or reckless disregard of a risk of harm from the third-person, when the Constitution requires intentionality to cause harm before regulating incitement.

The federal counterpart, 18 U.S.C. § 119, which was cited by Mr. Allen, ECF No. 121, p. 8, provides and interesting contrast to the Statute at issue. It prohibits a person from making restricted personal information of protected individuals publicly available when made with *intent* to threaten or incite a *crime of violence* or *intent* for the information to be used to threaten or facilitate a *crime of violence*. Charges under that statute involve the jurisprudence of incitement. *See e.g.*, *United States v. McNeil*, 228 F. Supp. 3d 809, 815 (N.D. Ohio 2017) (defendant allegedly posted home addresses of military service members and encouraged others to "[k]ill them in their own lands, behead them in their own homes, stab them to death as they walk their streets.")

Trooper Hiller suggests that the mere viewing of his information by any "criminal" poses a threat to his safety, and perhaps he earnestly is anxious about harm stemming from such a viewing. The fact that Mr. Scott's future publication of the Video and Affidavit of Service on the internet might make such a viewing possible, does not make the speech "directed" at the viewing. Further, the viewing of the information by a criminal is not "lawless action." The lawless action would concern how the criminal—of his own volition and without influence from

Mr. Scott—chooses to misuse the personal information. Finally, even under the *mens rea* of the Statute, there is no evidence that Mr. Scott knows or reasonably should know of a "imminent and serious threat" to Trooper Hiller's safety from the publication of the Video and Affidavit of Service.

Mr. Allen has cited no authority for the proposition that constitutionally protected speech today about public servants may curtailed by the state based upon how that information may be misused by another tomorrow. Such a premise runs afoul of the Free Speech Clause. "It would be remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).

*[remainder of the page is intentionally blank]*

## CONCLUSION

For all the forgoing reasons, the Court should deny Mr. Allen's motion for summary judgement. Rather, the Court should grant summary judgment in Mr. Scott's favor and declare that C.R.S. § 18-9-313 (the Statute) is unconstitutional under the First Amendment to the United States' Constitution.

Dated: October 27, 2023.

Respectfully Submitted,

*/s/ Jason C. Kennedy*

Jason C. Kennedy, Esq.
Sibylle M. Clark, Esq.
MONTGOMERY LITTLE & SORAN, PC
5445 DTC Parkway, Suite 800
Greenwood Village, Colorado 80111
Telephone: (303) 773-8100
Fax: (303) 220-0412
jkennedy@montgomerylittle.com
sclark@montgomerylittle.com

*Attorneys for Andrew Thomas Scott*